**CRIMINAL COMPLAINT**

ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>ALI KHALIL ELREDA, ROBERT BELL,<br>DALISA JOHNSON, CRYSTAL HILL,<br>JUAN MANUEL GONZALEZ,<br>JUAN JOSE GALINDO, FRANCISCO HIGUERA,<br>and ALFONSO BERNAL BARRON | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br><br>07-<br>**07-1844M** |

Complaint for violation of Title 21, United States Code, Section 846
(Conspiracy to Possess with Intent to Distribute and Distribute Cocaine)

| NAME OF MAGISTRATE JUDGE | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|
| HONORABLE VICTOR B. KENTON | | |

| DATES OF OFFENSES<br>August 7, 2006-<br>July 11, 2007;<br>August 16-29,<br>2007 | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

**SEE ATTACHMENT**

LODGED

2007 OCT 31 PM 2:29
CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:

FILED
CLERK, U.S. DISTRICT COURT

OCT 31 2007

CENTRAL DISTRICT OF CALIF.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the<br>foregoing is true and correct to the<br>best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>ERIC A. KISCHER |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT-DEA |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br><br>October 31, 2007 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.
BLH:blh                REC: DETENTION (warrant)

**ATTACHMENT**

<u>Count One</u>:  Beginning on or about August 7, 2006, and continuing to at least through July 11, 2007, in Los Angeles County, within the Central District of California, and elsewhere, defendants ALI KHALIL ELREDA, ROBERT BELL, DALISA JOHNSON, CRYSTAL HILL, JUAN MANUEL GONZALEZ, and JUAN JOSE GALINDO, and others known and unknown, conspired and agreed with each other to knowingly and intentionally (a) possess with intent to distribute and (b) distribute more than 5 kilograms of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

<u>Count Two</u>:  Beginning on or before August 16, 2007, and continuing to at least through August 29, 2007, in Los Angeles County, within the Central District of California, and elsewhere, defendants FRANCISCO HIGUERA and ALFONSO BERNAL BARRON, and others known and unknown, conspired and agreed with each other to knowingly and intentionally (a) possess with intent to distribute and (b) distribute more than 500 grams of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

<u>AFFIDAVIT</u>

I, Eric A. Kischer, hereby swear and affirm as follows:

## I.    INTRODUCTION

1.    I have been employed as a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") since October 2003.  I am currently assigned to a Southwest Border group of the Los Angeles Field Division, tasked to investigate large-scale narcotics organizations.  Prior to my current assignment, I was assigned to a DEA narcotics task force in Tucson Arizona, tasked to interdict and investigate narcotics organizations.  During my employment with the DEA, I have participated in numerous investigations of illicit drug trafficking organizations.  These investigations have involved the use of confidential informants, investigative interviews, physical surveillance, telephone toll analysis, and the service of search and arrest warrants.  I also completed the DEA Basic Agent School, a 16-week intensive training program at the DEA Academy in Quantico, Virginia, during which I received over 300 hours of comprehensive, formalized instruction in such matters as drug identification, detection, and interdiction; money laundering techniques; and asset identification, seizure, and forfeiture.

2.    This affidavit is made in support of a criminal complaint against and arrest warrants for two violations of 21

-1-

U.S.C. §§ 846, 841(a)(1) (conspiracy to distribute cocaine) by the following individuals:

     a.   Ali Khalil ELREDA ("ELREDA")

     b.   Robert BELL ("BELL")

     c.   Dalisa JOHNSON ("JOHNSON")

     d.   Crystal HILL ("HILL")

     e.   Juan Manuel GONZALEZ ("GONZALEZ")

     f.   Juan Jose GALINDO ("GALINDO")

     g.   Francisco HIGUERA ("HIGUERA")

     h.   Alfonso Bernal BARRON ("BARRON")

3.    I make this affidavit based upon information and evidence provided by witness statements, discussions, and reports submitted by other investigative law enforcement officers and agents, as well as physical evidence, telephone calls intercepted pursuant to court-authorized wiretaps, and my own personal knowledge and experience.  Because this affidavit is being submitted in support of a complaint, I have not included each and every fact known to me concerning this investigation.

4.    The intercepted conversations were in English or Spanish.  I base my knowledge of the contents of a call on transcripts or summaries prepared by agents or other monitors who listened to the calls; occasionally I have listened to the actual recording of a call.  For calls not in English, I have relied on translations.

5.   The identities of the suspects were ascertained through a variety of methods.  Some of these methods included names used by the speakers themselves during intercepted conversations, and surveillance activity, including enforcement activity by local law enforcement agencies, where the drivers of particular vehicles were identified.  The speakers also were identified by subscriber information, surveillance, voice identification by agents and monitors who have compared voices, or by the speakers' own identification of themselves.  The intercepted conversations were occasionally in English, but primarily in Spanish.

6.   During the intercepted conversations, the conspirators often would use cryptic or coded language to discuss narcotics trafficking over the telephones.  Through training and experience, I have determined that many of the terms used describe narcotics or narcotics-related activity.

## II.  PROBABLE CAUSE THAT CRIMES HAVE OCCURRED

A.   OVERVIEW OF THE INVESTIGATION

7.   Based on my participation in this investigation, I know the following:

a.   The government is investigating the use of clothing stores in the Los Angeles area to facilitate and disguise illegal activities, including drug trafficking, sale of counterfeit clothing, bulk cash smuggling, and other crimes.  One of the stores under investigation is HIP HOP CONNECTIONS, which

-3-

until recently was owned by ELREDA.  He continues to work there as the store's manager.

   b. Between August 2006 and August 2007, the government obtained court-authorized wiretaps on cell phones used by ELREDA, BELL, EPIFANIO MERCADO[1], GONZALEZ, and HIGUERA, and also the landline telephone at HIP HOP CONNECTIONS.

   c. Intercepted calls on these phones and other information obtained from the investigation revealed that:

    (1) ELREDA has acted as a bulk cash smuggler as well as a broker for narcotics traffickers BELL and MERCADO.

    (2) BELL has acted as a source of supply for ELREDA and numerous other persons.

    (3) MERCADO, GONZALEZ, GALINDO, HIGUERA, have been sources of supply for BELL.  HIGUERA also supplied another trafficker (Count Two).

    (4) NAVA has acted as a narcotics transporter for MERCADO and BELL.

    (5) BARRON has acted as a transporter for HIGUERA.  (Count Two).

---

[1] EPIFANIO MERCADO ("MERCADO") and RICARDO NAVA ("NAVA") are two drug dealers who are mentioned in this affidavit, but are not charged in this complaint.  A separate complaint containing charges against them already was approved by the Honorable Suzanne H. Segal, United States Magistrate Judge, so MERCADO and NAVA are not charged in the instant complaint.

-4-

>       (6)   JOHNSON has acted as a lookout for a
>             narcotics transaction involving BELL,
>             MERCADO, and NAVA.
>
>       (7)   HILL has acted as a stash house keeper and
>             facilitator for BELL.

B.   TRANSACTIONS AMONG ELREDA, MERCADO, AND BELL

     8.   From reviewing intercepted calls, I know the following
conversations occurred on August 7, 2006 among ELREDA, MERCADO,
and BELL:

     a.   On August 7, 2006, ELREDA spoke to MERCADO and
MERCADO was reluctant to meet BELL; however, ELREDA told MERCADO
that ELREDA would take money from BELL.  ELREDA then would call
MERCADO so that MERCADO could pick up his money the next day.

     b.   On August 7, 2006, ELREDA spoke to MERCADO and
ELREDA told MERCADO that BELL wanted "five" (referring to five
kilograms of cocaine).  ELREDA also told MERCADO that eventually
MERCADO would provide 10 or 15 kilograms to BELL.  ELREDA told
MERCADO that MERCADO could give the quantity to BELL on ELREDA's
behalf.

     c.   On August 7, 2006, ELREDA spoke to BELL and asked
BELL how many BELL needed.  BELL informed ELREDA that he wanted
"a hand."  (A "hand" is a common narcotics dealer reference to
five kilograms of cocaine.)

     d.   On August 7, 2006, ELREDA informed MERCADO that

BELL wanted "five for today" and that he (BELL) will pay no later than tomorrow. ELREDA also informed MERCADO that BELL would want 10 and then 15, at later times.

e.   On August 7, 2006, ELREDA asked MERCADO how much the price would be if BELL paid MERCADO today. MERCADO told ELREDA that at the quantity of three, to "drop a dollar." ELREDA asked if MERCADO meant "twelve-three." MERCADO replied yes.

f.   On August 7, 2006, ELREDA informed BELL to drop a dollar off of each one.

g.   On August 7, 2006, BELL called ELREDA and said that if they were "right," BELL would buy ten.

h.   On August 7, 2006, ELREDA called MERCADO and said that if they were good, BELL would pay for ten right now. MERCADO also told ELREDA to tell BELL that MERCADO will take them to BELL and MERCADO will call ELREDA to say when they are ready, so BELL can be ready.

9.   BELL and MERCADO arranged for an eight-kilogram cocaine deal to occur on November 1, 2006. Based on information obtained from the wiretaps and law enforcement officers observations, I know the following occurred:

a.   On November 1, 2006, at approximately 1:02 p.m., BELL placed an outgoing call to NAVA, who was delivering the cocaine on behalf of MERCADO. During that call, BELL asked NAVA

-6-

where he was at.  NAVA told BELL he was at a shopping center at a
Staples.

    b.    At approximately 1:10 p.m., BELL placed an
outgoing call to his customer for the cocaine.  During that call,
BELL told his customer that he was over by Staples and was scared
by some people he saw there.  The customer said he would be there
soon.

    c.    At approximately 1:14 p.m., BELL received an
incoming call from telephone number 323-202-8419, a telephone
utilized by JOHNSON.  At the time of this call, Los Angeles
Sheriff's Department (LASD), Lakewood division had set up in the
Staples parking lot off of the 91 freeway and Lakewood Boulevard.
During that call, the following conversation took place:

            BELL:  Hello

            JOHNSON:  I don't think you should tell that guy

            [apparently referring to BELL's customer] to come

            in this parking lot... whoever you waiting for.

            BELL:  They left?

            JOHNSONDALISA:  No cause you got some police

            sitting like on the street over here.

            ROB:  All right.

            DALISA: All right.

    d.    BELL was observed briefly entering NAVA's car,
then getting out.  Los Angeles Sheriff's Department ("LASD")

deputies then arrested NAVA and seized the eight kilograms of cocaine.  They later released NAVA so that the wiretaps would not be prematurely disclosed.

   e. In calls BELL made shortly after NAVA's arrest on November 1, 2006, JOHNSON can be heard in the background.

   10. I have reviewed the following intercepted calls that relate to the seizure of eight kilograms of cocaine on November 1, 2006.

   a. On November 1, 2006, BELL called ELREDA and ELREDA informed BELL that MERCADO was looking for BELL.  ELREDA asked BELL if they (police) were holding the sweaters.  BELL said yeah. BELL told ELREDA that MERCADO told him (BELL) that he (MERCADO) had 8 or 10 left and wanted to get rid of them.  BELL told ELREDA that MERCADO's cousin (NAVA) had called him (MERCADO) in the morning and told MERCADO to call BELL to get rid of them.  BELL told ELREDA that he (BELL) agreed to "change" it with his cousin (NAVA) and meet.  ELREDA told BELL that he (ELREDA) would have MERCADO call BELL.

   b. Based on my training, experience, and the investigation to date, I believe that ELREDA is using coded language to ask BELL if "they," meaning the police, were holding the "sweaters," meaning the cocaine, seized by the LASD.  BELL confirmed that the police had seized the cocaine.

   c. On November 1, 2006, MERCADO called HIP HOP

CONNECTIONS and spoke to an employee named Martell Taylor

("Taylor").   MERCADO threatened to kill Taylor after Taylor

refused to provide ELREDA's phone number.

      d.   On November 1, 2006, MERCADO called ELREDA, and

ELREDA informed MERCADO that MERCADO's cousin (NAVA) had been

arrested.  At first MERCADO did not believe it.  ELREDA told

MERCADO that BELL had seen everything, and MERCADO said that was

weird.  ELREDA told MERCADO that it sounded weird to him

(ELREDA).  ELREDA provided MERCADO with telephone number 562-676-

0514, then MERCADO asked ELREDA to call BELL and instruct BELL to

answer the phone when MERCADO called BELL from Mexico, from a

blocked number.

      e.   On November 1, 2006, BELL called ELREDA and ELREDA

informed BELL that MERCADO was looking for him.  ELREDA warned

BELL that MERCADO will "crack his vending machine" if they get

hot with him (MERCADO).  ELREDA also referred to himself as the

"middle man" between MERCADO and BELL.

11.  On November 4, 2006, ELREDA also helped broker a deal

between BELL and a drug dealer named "CHACA" in which BELL would

be the supplier of the drugs.

      a.   On November 4, 2006, ELREDA asked BELL for the

price of one box of T-shirts.  BELL responded, "13 dollars a

pair."  ELREDA asked, "huh?" and BELL restated "13 dollars per

shirt."  BELL informed ELREDA that he (ELREDA) should charge his

friend (CHACA) 35 (13,500 dollars).  ELREDA asked BELL if he
could tell CHACA to have his wife ready to pick up.  BELL said
yes.

      b.   Based on my training, experience, and the
investigation to date, I believe that BELL made a mistake with
his coded language of "13 dollars a pair" when responding to
ELREDA's request, in coded language, for the current price of a
kilogram of cocaine, "one box of T-shirts."  According to BELL,
one kilogram of cocaine costs $13,000 (13 dollars a pair).

      c.   On November 4, 2006, ELREDA informed CHACA that
the price for the T-shirt box was 14.  ELREDA informed CHACA that
his buddy (BELL) was providing one to show CHACA, then if it was
OK, CHACA could get two more (from BELL).

      d.   Based on my training, experience, and the
investigation to date, I believe that ELREDA told CHACA the price
for the T-shirt box, coded language for one kilogram of cocaine,
was 14 ($14,000) in order to make a $1,000 profit, as BELL was
going to sell one kilogram of cocaine to ELREDA for $13,000.

C.   THE TENNESSEE TRANSACTION AND ITS AFTERMATH

     12.   On November 29, 2006, FBI Special Agents Scott Foster
and Kristen Elliott observed and identified BELL and MERCADO as
passengers on Southwest Airlines flight 2658 departing LAX to
Nashville, Tennessee.  The government had been alerted from
intercepted telephone calls that BELL and MERCADO would be

-10-

traveling to Nashville to complete a large drug deal.

13.   I know from my direct participation in the investigation and discussions with other agents that the following events occurred in Nashville.

a.   On December 1, 2006, BELL called HILL and yelled aside "are we gonna eat?"  BELL told HILL that there was some shit going on around there.

b.   Based on my training, experience, and the investigation to date, I believe that BELL is asking someone else, not HILL, if he and that other person are going to conduct a cocaine deal.  "Are we gonna eat?" is BELL's common reference to doing a cocaine deal.  I also believe that the "there" BELL is referring to is Tennessee, because he was located in Tennessee at the time of this call.

c.   On December 1, 2006, a state search warrant was served on 2211 Ladd Street, Clarksville, Tennessee.  State law enforcement officers arrested Edwin Moore, Hector Galvan, BELL, Anthony Johnson, John Monzell Banks, and Adrian Dewayne Patterson.  Approximately one kilogram of cocaine was seized. DEA-Tennessee seized $302,190 from 2211 Ladd Street, Clarksville, Tennessee.

d.   MERCADO had left Nashville before the seizure and arrests took place.  BELL was released from custody so that the wiretaps were not prematurely revealed.

-11-

14.   Based on intercepted calls and other sources, I know that the following events took place after the seizure in Tennessee.

a.   On December 3, 2006, BELL called ELREDA.  ELREDA told BELL that MERCADO had already told him (ELREDA) that they got busted.  ELREDA also said that MERCADO could not find his cousin.  ELREDA asked BELL if BELL was in trouble and BELL said they took the money, that's all.  BELL told ELREDA that MERCADO's cousin was at home because BELL had dropped him off.  ELREDA told BELL that he may not want to do business with BELL anymore because BELL may be watched by law enforcement.  BELL told ELREDA that he didn't need ELREDA or anybody.

b.   On December 3, 2006, BELL called ELREDA and ELREDA pleaded with BELL to call MERCADO because MERCADO was "murdering" ELREDA with phone calls.  ELREDA said that MERCADO asked ELREDA to tell BELL to answer the phone.  BELL said OK, and asked ELREDA to tell MERCADO to call.

c.   On December 9, 2006, RAFAEL NAVA-MERCADO ("NAVA-MERCADO"), MERCADO's uncle, was arrested in Wabaunsee County, Kansas, in possession of 18 bricks of cocaine (total weight: 20.20 kilograms).

d.   On December 11, 2006, MERCADO called an unknown male and explained that BELL was a "fuck up" and that BELL had made MERCADO go there, and now MERCADO could not find his driver

-12-

for four days.  MERCADO explained that everything looked suspicious when they got off the plane, but BELL did not believe MERCADO.  MERCADO said they could not find the truck.  MERCADO asked the unknown male to call BELL.

e.  Based on my training, experience, and the investigation to date, I believe that MERCADO's "driver" was his uncle, NAVA-MERCADO, who was to deliver the 18 bricks of cocaine to the narcotics deal in Tennessee.

f.  On December 12, 2006, MERCADO called SKIP Last Name Unknown (LNU) ("SKIP") and SKIP asked if MERCADO had heard from his uncle.  MERCADO said they were about to put him (uncle) into America's Most Wanted.

g.  On December 15, 2006, an unknown female called MERCADO and MERCADO asked the unknown female if she had heard anything about MERCADO's uncle.  The unknown female said she had not.  During the conversation MERCADO stated that he (MERCADO) had given his uncle $70,000 to buy the truck.

h.  On December 16, 2006, GALINDO called MERCADO. MERCADO asked if GALINDO spoke to BELL.  GALINDO said not much and the last time was when GALINDO went to the store.  GALINDO said that "JUANITO" speaks to BELL more because "JUANITO" can provide 40 or 80 to BELL at a time.  GALINDO told MERCADO that he (GALINDO) had provided 20 to MERCADO before.  MERCADO said he had found the uncle and that the uncle had been in Kansas.  GALINDO

-13-

told MERCADO that BELL told GALINDO that all that had happened
was that the "paper" was lost.  MERCADO told GALINDO that all the
family was against MERCADO now and that everything leads back to
the "Indian Guy."

      i.  Based on my training, experience, and the
investigation to date, I believe that GALINDO and MERCADO are
discussing the arrests of the individuals in Tennessee on
December 1, 2006.  I also believe that BELL used coded language,
"paper," for the money that was seized by law enforcement.  I
further believe that MERCADO is blaming the problems with law
enforcement on this narcotics deal on ELREDA, the "Indian Guy."

D.  FURTHER NARCOTICS ACTIVITIES INVOLVING GALINDO, HILL, AND
    GONZALEZ

      15.  In part because of the events in Tennessee, there was a
falling out between BELL and MERCADO, which caused MERCADO to
cease to be a supplier of cocaine to BELL (although MERCADO's
associates GALINDO and GONZALEZ continued to deal with BELL).

      16.  On February 1, 2007, intercepted conversations
indicated that BELL needed 13 kilograms from GONZALEZ, for a
customer located in Compton, CA.  Eventually GONZALEZ informed
BELL that only 12 kilograms of cocaine were available.  BELL
agreed to take all of them.  Intercepted calls between BELL and
GONZALEZ made it clear to DEA agents monitoring the court-
authorized interception that BELL would meet GONZALEZ in the area
of 149th Street, near a Church's Chicken fast food stand.

17.  On February 1, 2007, DEA agents listening to
intercepted conversations relayed information to other law
enforcement personnel, resulting in the eventual traffic stop of
GONZALEZ, after he (GONZALEZ) had apparently received money from
BELL for the sale of cocaine.  GONZALEZ was arrested in
possession of approximately $95,000 in U.S. currency.  This money
was seized by DEA as suspected proceeds of a narcotics
transaction and GONZALEZ was later released so as not to endanger
the continuing investigation.

18.  HILL, aka "SWAY," was intercepted many times during the
course of monitoring BELL's phones.  While many of these calls
concerned a romantic relationship between them, other calls
concerned HILL's active participation in the narcotics
conspiracy.

a.   On March 1, 2007 BELL called HILL and said "you
know what you got over at your house?"  HILL replied "yeah."
BELL continued, "someone returned three of them."  BELL continued
to explain to HILL that the customer had claimed the kilograms
were open but BELL said he did not deal like that.  BELL also
told HILL that he (BELL) wanted to kill the customer.  HILL said
that BELL needed to watch their people.

b.   Based on my training, experience, and knowledge of
this investigation, I believe the above call indicates that BELL
used HILL as a "stash house keeper."  I know that drug dealers

-15-

often enlist others to store their illegal narcotics, in case surveillance agents follow the drug dealer to their residence. In this way, a drug dealer who goes home is not at risk of having illegal narcotics discovered by a legal search executed by law enforcement.  However, the stash house keeper is also protected by this method, because this individual is not a street-level dealer and will never be observed in a hand-to-hand transaction in a public place.

c.   On March 3, 2007, BELL called HILL and stated that HILL needed to give that bag to the "stupid-ass Mexican." Approximately 15 minutes later, BELL called HILL and told HILL to give it to him (Mexican) and that the guy would come to the front of HILL's apartment.  BELL went on to verify HILL's address as being on Chadron and 135th.  HILL confirmed her address to be in this area.

d.   Based on my training, experience, and knowledge of this investigation, I believe the above call demonstrates that BELL does in fact use HILL as a "stash house keeper" and did store illegal narcotics, specifically cocaine, at HILL's apartment from March 1, 2007 to March 3, 2007.

e.   On April 2, 2007, BELL called HILL and discussed the shortage of cocaine and how GALINDO had called the cops on himself and ended up getting busted for cocaine and narcotics proceeds possession while reporting a robbery.  BELL also told

-16-

HILL about GONZALEZ, who was afraid because of the money seizure on February 1, 2007.

19.  On March 30, 2007, GALINDO reported an attempted break-in and robbery to the Maywood Police department:

a.  A subsequent inspection of GALINDO's apartment by officers revealed evidence of cocaine trafficking.  Specifically, officers seized 301 grams of cocaine, $74,227, a cash counting machine, a calculator, and several cut and empty kilo-sized packages consistent with the packing of kilograms of cocaine.

b.  Based on my training, experience, knowledge of calls intercepted in this investigation, and my reading of the police report filed by Maywood Police department regarding GALINDO, I believe GALINDO is a multi-kilogram cocaine distributor and a source of supply for cocaine to BELL.  Numerous calls were intercepted during which BELL would proclaim his need to deal with GALINDO and his (BELL's) frustration with GALINDO being locked up in jail.  Between the shortage of cocaine and BELL's reliance on GALINDO, the period of time after GALINDO's arrest was difficult for BELL because, according to intercepted calls, BELL was unable to transact the amount of cocaine he needed for his customers.

20.  Intercepted telephone calls between BELL and GALINDO indicate an ongoing relationship for the purpose of transporting and selling cocaine:

-17-

a.   On June 26, 2007 GALINDO called BELL and informed BELL that the price of a kilogram of cocaine would be "55" ($15,500).  BELL replied that he (BELL) was cool (would pass on this offer).

b.   Based on my training, experience, and knowledge of this investigation, I believe the above call indicates that BELL wanted a lower price for a kilogram of cocaine than GALINDO was offering.

c.   On July 10, 2007, BELL called JOHNSON and stated that if "JJ" (GALINDO) comes through on Thursday, BELL could feed everybody and leave again.

d.   Based on my training, experience, and knowledge of this investigation, I believe the above call indicates that BELL would like to provide cocaine to all his customers and that the realized profit from doing so would allow him (BELL) to take another vacation with his girlfriend JOHNSON.

e.   On July 10, 2007, GALINDO called BELL and said that he (GALINDO) thinks it will be Thursday or tomorrow and that he was not sure.  In a later call, GALINDO reinforced that the delivery would be on Thursday and informed BELL that cocaine was pretty hard to get right now.  Shortly thereafter, BELL called GALINDO and GALINDO asked BELL if the order was the same.  BELL said he would tell GALINDO tomorrow because he (BELL) needed to ask some other people.

-18-

E.    HIGUERA AND BARRON SUPPLY COCAINE

21.    During the court-authorized wiretaps described above,
HIGUERA was intercepted as a source of supply for BELL.
Subsequently, DEA agents began intercepting HIGUERA's phone and
the following conversations occurred:

a.    On July 11, 2007, BELL spoke to HIGUERA and
HIGUERA quoted the price of cocaine to BELL as being 5-8 (15,800
dollars per kilogram).   BELL told HIGUERA that GALINDO provides
cocaine to BELL at 14,800 (per kilogram) every week.

b.    Based on my training, experience, and knowledge of
this investigation, I believe the above call indicates that BELL
attempted to use his contact with multiple sources-of-supply as a
bargaining chip.   In the above call, I believe BELL was trying to
force HIGUERA to lower the price per kilogram of cocaine by lying
about the price GALINDO provides to BELL.

22.    Interception on HIGUERA's phone was initially thought
by DEA agents to be a method of intercepting BELL's narcotics
trafficking activity.   Instead, this interception revealed more
about narcotics trafficking activity by HIGUERA and BARRON with
individuals other than BELL.

23.    On August 16, 2007, HIGUERA spoke to various
individuals as he was working out a narcotics deal.   HIGUERA
spoke to "CHRIS" and provided a price to CHRIS of "6," meaning
$16,000 per kilogram of cocaine.   HIGUERA then called his source

of supply, "CHINO," and ordered 7 kilograms.  Subsequently,
HIGUERA verified the order of 7 kilograms with CHRIS, then called
upon his associate BARRON to come and pick him up.  Intercepted
calls verified that BARRON picked up HIGUERA and drove both of
them, plus the 7 kilos of cocaine, to CHRIS.  HIGUERA called
CHRIS to verify their arrival and HIGUERA also verified on the
phone when he could see CHRIS.

   24.  On August 29, 2007, South Gate Police Department
initiated a traffic stop on three vehicles, one which was driven
by BARRON.  Hidden in BARRON's vehicle was 3 kilograms of
cocaine.  A second vehicle was driven by HIGUERA.  A third
vehicle was driven by an individual named MIGUEL and contained
$345,000.  After his arrest, BARRON admitted that the kilograms
of cocaine belonged to HIGUERA and that both of them (HIGUERA and
BARRON) were on their way to deliver the cocaine to a customer.

   25.  Based on my training, experience, knowledge of this
investigation and the above-noted calls and seizures, I believe
HIGUERA is a cocaine source of supply and BARRON is an illegal
narcotics courier, working with HIGUERA.

**III. SEALING**

   26.  At or around the time the arrest warrants requested
herein are executed, law enforcement officers will be arresting
multiple targets of the government's criminal investigation and
executing multiple search warrants at numerous locations within

Los Angeles County and elsewhere within the Central District of California.  Premature disclosure of the contents of this affidavit could seriously impede the government's efforts to execute the additional arrest and search warrants by providing unarrested targets with information that may result in their attempts to flee or to destroy evidence.  Accordingly, I request that the Court issue an order sealing this affidavit until the arrest warrants are executed and the defendants are taken into custody, or until further order of this Court.

## IV.  CONCLUSION

27.  Based on my training, experience, and consultation with other Special Agents and law enforcement officers, and the above facts enumerated in this affidavit, I believe that probable cause exists to believe that ELREDA, BELL, JOHNSON, HILL, GONZALEZ, GALINDO, HIGUERA, and BARRON have violated 21 U.S.C. §§ 846, 841(a)(1) (conspiracy to distribute cocaine).

ERIC A. KISCHER
Special Agent
Drug Enforcement Administration


SUBSCRIBED TO AND SWORN BEFORE ME
THIS _21_ DAY OF OCTOBER, 2007

HONORABLE VICTOR B. KENTON
United States Magistrate Judge

-21-